# EVANS et al. v. BALES et al., Appellants.

## Division One, May 21, 1902.

**Deed of Trust: FRAUDULENT NOTES.** Where a confidential agent who has obtained his principal's money for investment, sells his property to straw men, and takes their notes in payment therefor, secured by a deed of trust, and then has the property so incumbered conveyed to his principal for an expressed consideration of nearly twice the amount of the notes, and in addition, recites in the conveyance that the principal assumes the payment of the notes, but does not deliver the deed, but turns over the notes to his brother, who knew all about the transaction, and causes him to foreclose the deed of trust and buy in the property, after he had agreed with his principal that the deed of trust should not be foreclosed or the property sold until it could be sold for enough to reimburse him and pay off the notes, the court will hold the sale to the straw men, and the notes, and the deed of trust, to be fictitious, and simply a device of the agent to cover up his property and work a fraud on his principal, and will enjoin him and his brother from setting up any claim to the land, and will vest it in the principal.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,*
Judge.

AFFIRMED.

*Geo. B. Strother* and *C. O. Tichenor* for appellants.

(1) The great weight of the testimony is to the effect that Bales simply said, "I don't expect you to pay off that deed of trust;" "I will not bring it against the property unless it sells for enough to pay both;" "those notes should not be in the way, and that she need have no regard for them; that they would not be claimed against her unless the property sold for

Vol 168 mo—43.

enough to pay the amount of money invested for her and the notes also. He expressly stated to that effect." These talks took place some seven years after her purchase of these lots. There was no question but that these notes, and the deed of trust securing them, were valid. These conversations were mere statements of his intention in reference to them. McClanahan v. Schincker, 45 Mo. 20; Tod v. Beard, 31 Mo. 459; Hosea v. Rowley, 57 Mo. 359; Rucker v. Robinson, 38 Mo. 158. (2) "Courts of equity never lend their aid to the enforcement of forfeitures." Sease v. Foundry Co., 141 Mo. 496; Shaeffer v. Blair, 149 U. S. 248. (3) Certainly, even upon her theory of this case, plaintiff must make a tender of what is due upon 'these notes, less any damage which she can show she has suffered by this act of her agent. Before the sale she should have tendered this amount. Ferguson v. Soden, 111 Mo. 213; Kraus v. Givens, 110 Mo. 66; Barnes v. McMullins, 78 Mo. 270. (4) The petition is based upon an agreement to the effect that Bales would not claim the payment of the notes "unless or until the property securing them should bring enough to pay the amount paid by plaintiff for said lots and also the amount of said notes." It is decreed, however, that the deed of trust is fraudulent and void, and the notes are decreed to be delivered up to plaintiff for cancellation and the defendants are perpetually enjoined from asserting any title, right, claim or interest, legal or equitable, in or to said lots.

*D. C. Allen* and *Jas. F. Mister* for respondents.

(1) It was competent for William Bales to make the agreement he did with Mrs. Evans, and it is a valid agreement, and is binding on him. The evidence of · his making the agreement is overwhelming and destroys his denial. The consideration for it is ample, as in settlement or satisfaction of a real controversy, and a partial restitution for losses caused by

his fault and folly.   He was in possession of and the owner of the notes at the time (May, 1894), and for a long time afterwards (up to 1897), and the notes were long past maturity and subject to all proper and valid defenses.   Leahey v. Witter, 123 Mo. 207; Slowen v. McMurray, 27 Mo. 118.   (2) The Johnson-Haskins affair does not in anywise affect Mrs. Evans.   There was never any actual delivery to her, Haskins or anyone for her, of the notes in controversy, nor to S. H. Bales until 1897, and then only for another purpose in which trust was betrayed.   The whole transaction of the foreclosure sale seems to have been an attempt to get the lots for the Bales family at a nominal price, and the denial of knowledge of the pledge by William Bales to Mrs. Evans is of a piece with the denial of the agreement itself.   Such jugglery could not reach, much less affect or take away, the rights of Mrs. Evans.   Her defense of the agreement with William Bales, on notes past maturity is as good against the Haskins woman and Samuel H. Bales as it is against William Bales himself. An agent can not set up (or be protected by) his own breach of trust.   6 Mews' Eng. Case Law Digest, 457, and cases cited. (3) So far as Samuel H. Bales is concerned, he is in no position to claim the rights of an innocent purchaser without knowledge.   Even if he acted on the false representations to him of his brother (which is improbable) he is bound by his (William Bales's) actual status in his relation to Mrs. Evans. His betrayal of trust with his own brother in the keeping and using of notes only loaned to him temporarily for a particular purpose, and his negotiations with the Haskins woman after being the purchaser at his own sale, foreclosing notes which he did not own or hold (except by trickery), places him in a very delicate position.   If he has suffered loss, in his attempt at overreaching, he only gets his deserts.   1 Am. and Eng. Ency. (1 Ed.), p. 415; Bank v. Vorsta, 30 La. Ann. 587; Ins. Co. v. Ins. Co., 4 Mo. App. 578.   (4) "The most open and disinterested dealing is required of a confidential agent while

he consents to act as such, and there must be an unambiguous relinquishment of his agency before he can acquire an interest in the subject of it. To leave a doubt on this subject is to turn himself into a trustee." Bartholomew v. Leach, 7 Watts (Pa.) 172; Murdock v. Milner, 84 Mo. 102; Grumley v. Webb, 44 Mo. 445; Martin v. Barker, 135 Mo. 503; 2 White & Tudor's Leading Cases in Equity, p. 1156; Hamilton v. Armstrong, 120 Mo. 615; Cadwallader v. West, 48 Mo. 496; Switzer v. Connett, 11 Mo. 88; Kanada v. North, 14 Mo. 615; Rechshud v. Bank, 47 Mo. 181; Hale v. Hopkins, 14 Mo. 486; Connor v. Black, 119 Mo. 134; Ins. Co. v. Smith, 117 Mo. 294; 1 Story's Equity Jurisprudence (10 Ed.), secs. 315, 316a, 322, 329, 385; Whelun v. McCrary, 64 Ala. 319; 1 Am. and Eng. Ency. of Law (10 Ed.), p. 375.

MARSHALL, J.—This is a bill in equity to set aside a trustee's deed to Samuel H. Bales, made under a foreclosure of a deed of trust, and to cancel the deed of trust and the notes secured thereby, and to declare the title to the land to be fully vested in the plaintiff, Sarah M. Evans.

Mrs. Evans's husband was a brother of defendant William Bales's first wife, and Samuel H. Bales and William Bales are brothers. William Bales and the Evans family were socially quite intimate. In 1887 Mrs. Evans had $16,808.10 in money. She spoke to William Bales about investing it for her in real estate in Kansas City, saying as other persons seemed to be making money in Kansas City real estate, she would like to make some also. William Bales told her he had made money for himself and for others in real estate speculations in Kansas City and that he could make money for her, too. She says that the contract was that she was to place her money in Bales's hands for investment and he was to make it earn two thousand dollars in one year, and at the end of the year he was to return her the principal and the two thousand dollars earned, and was to keep for himself anything that was

earned above the two thousand dollars.     Bales admits he
agreed to invest her money for her, but denies that he agreed
that it would yield any particular profit.    At any rate, Mrs.
Evans deposited the money in the Kansas City Savings Bank,
and Bales checked it out, and she says she has never received
a penny of it in return, except forty-five dollars a month rent
for the property in question while it was rented as a lemonade
stand, and that she has never been able to get an intelligent
statement from Bales as to what he did with the money or
where he invested it, except that he told her he had bought the
property in dispute and that the railroad would have to have
it and she would make a profit on it.

The fact is that Bales had owned the property, it being
lots 2, 3 and 4 in block 2 of William Bales Second addition to
Kansas City, and on March 31, 1887, he sold it to S. H. Gor-
ham and E. C. Sattley for $7,000.    They gave him two
notes therefor for thirty-five hundred dollars each, payable
at one and two years, secured by deed of trust on the
property.    On June 13, 1887, Bales procured Gorham and
Sattley to convey the property to Mrs. Evans for an alleged
consideration of thirteen thousand five hundred dollars, sub-
ject, however, to the deed of trust for seven thousand dol-
lars which Bales then held, and which incumbrance the
deed recited that Mrs. Evans assumed and agreed to pay.
This deed was not delivered by Bales at that time, but after
recording it, Bales retained it in his possession, and Mrs.
Evans never saw it, and never knew or heard that she had
assumed the payment of the seven thousand-dollar deed of
trust to Bales, until two years thereafter.    Bales attempted
to show that she was present when the deed was made and
knew all about it, but the attempt was a failure, and is not
entitled to be called substantial proof of his claim.    Mrs.
Evans was threatening to sue Bales for an accounting and to
recover her money, when Bales agreed that he would not de-
mand payment of the deed of trust unless the property

could be sold for enough to repay Mrs. Evans for her money invested and to pay the deed of trust also, and that she should not be called on to pay the deed of trust or any interest thereon in any event, and that the deed of trust should not be enforced against the property until Mrs. Evans was reimbursed. Upon this agreement Mrs. Evans refrained from bringing suit, and the matter remained in this condition, so far as Mrs. Evans was concerned, until 1898, when Mrs. Evans discovered that the deed of trust had been foreclosed and that Samuel H. Bales had become the purchaser. During that interim Mrs. Evans had paid the taxes, but Bales had never asked and she had never paid a cent of interest on the deed of trust. Both notes bear indorsements of interest paid up to October 1, 1889, but Mrs. Evans never paid it, and it does not appear that anyone else ever did so. The two-year note also has indorsed on it a credit of $1,000 on September 1, 1889, and when Mrs. Evans had an expert accountant examine her account in the bank, that Bales alone had been checking against, it developed that Bales had applied $1,000 of her money on that note, but Mrs. Evans never knew of it and never consented to it.

It is significant that, although the petition sets up the agreement as to the deed of trust, in consideration of which Mrs. Evans abstained from bringing suit, William Bales contents himself with filing a general denial, and on the trial makes the statement that the experts' report showed that Mrs. Evans owed him $1,100. This, too, in face of the conceded fact that he received $16,808.10 of her money, that he never returned her a penny of it, and does not attempt to show what became of any of it except the statement in the deed from Gorham and Sattley that he paid them $13,500 for land on June 13, 1887, which they purchased from William Bales on March 31, 1887, and in payment of which they gave notes amounting to $7,000, secured by deed of trust on the land itself.

It further appears, however, that after making the agreement with Mrs. Evans, in 1889, about the deed of trust, on September 1, 1890, Bales became involved in financial trouble with a man named Johnson and that to secure Johnson from loss he set aside the seven thousand dollar notes and deed of trust as collateral security for Johnson. He did not indorse the notes, however, and there is no evidence that he ever delivered them to Johnson, but he kept them in his possession, and, as Samuel H. Bales expresses it, "he said he would lay this note by for Johnson and he would credit that note when he drawed on him. And he had that note laid by for Johnson." So it remained "laid by for Johnson," from September 1, 1890, to June 4, 1896, during which time Bales says he paid Johnson $2,900, and then Johnson died, and the note then passed to Johnson's wife, and she too died on the same day. Then the note passed to Johnson's niece, a Miss Haskins. She was possessed of more "push" than her uncle or aunt, for it appears from the testimony of Samuel H. Bales, that on June 4, 1896, the very day Johnson and wife had died, she demanded the money from William Bales. He was unable to pay her anything, but Samuel H. Bales swears "that note stood good for the money, and on June 4, 1896, I let her have $500." Thereupon, William Bales, without the knowledge or consent of any one, turned over the notes and deed of trust to Samuel H. Bales, and on May 14, 1898, Samuel H. Bales caused the deed of trust to be foreclosed and became the purchaser of the property. This he did without the knowledge of Mrs. Evans or of Miss Haskins; whether or not William Bales knew of it does not appear. At any rate on August 20, 1898, three months after the foreclosure, Miss Haskins demanded further payments, and Samuel H. Bales let her have $200 more. Later she demanded more payments, and as they were not made she threatened to place the matter in the hands of her attorneys. Thereupon Samuel H. Bales offered to give

her $1,400 "if she would sign a clear receipt against William Bales," which she did, and he paid her the money.

The answer of Samuel H. Bales is a general denial, except admitting that he purchased the property at the foreclosure sale, and a special plea setting up the matters herein stated as to the $7,000 deed of trust, and as to the Haskins matter, and the foreclosure of the deed of trust, and his purchase of the property.

Upon this showing the circuit court set aside the trustee's deed to Samuel H. Bales, held that the seven-thousand-dollar deed of trust was fraudulent and ordered it to be delivered to the plaintiff for cancellation, perpetually enjoined the defendants from asserting any right, title, interest or claim in or to the property, and adjudged that the fee thereto was fully vested in the plaintiff, but ordered the plaintiff to pay to Samuel H. Bales the taxes he had paid amounting to $526.24. The defendants appealed.

## I.

The circuit court treated the deed of trust and notes made by Gorham and Sattley to William Bales, as fraudulent, and that court further held that Samuel H. Bales never acquired any title to the notes or deed of trust and that his foreclosure of the deed of trust was without any authority in law, and therefore that court set aside the sale under the deed of trust and ordered the deed of trust and notes secured thereby to be cancelled.

Upon the facts proved there could be no doubt in the mind of any court that the decision of the circuit court is eminently right and just.

The grouping of a few of the salient facts and circumstances shown by the record will conclusively demonstrate the correctness of this judgment.

First.   Neither Gorham nor Sattley appear in this case

in any manner nor in any way. They neither asserted any right or claim nor appeared on the scene at any time.

Second. Gorham and Sattley do not appear to have paid Bales a penny for the land. They gave two notes for $3,500 each, payable at one and two years, secured by deed of trust on the land purchased, and they never paid a cent on these notes. Bona fide sales of real estate are never made in such a manner.

Third. If the conveyance to Gorham and Sattley on March 31, 1887, for seven thousand dollars, was made in good faith and for the value of the property, then the conveyance from Gorham and Sattley to Mrs. Evans, which William Bales engineered, on June 13, 1889, was incomprehensible, for it could not be true, that the property increased in value in two months and a half from seven thousand dollars to twenty thousand five hundred dollars, and this was the value thereof according to the deed from Gorham and Sattley to Mrs. Evans; that is, thirteen thousand five hundred dollars cash, and the assumption by her of the deed of trust for seven thousand dollars.

Fourth. No man could be made to believe that William Bales acted properly toward Mrs. Evans when he expended $13,500 of Mrs. Evans's $16,808.10 in the purchase of the equity of redemption in this land; aye, more, the payment of such an amount of cash for the equity of redemption was bad enough, but the assumption of the $7,000 deed of trust held by William Bales in addition to the payment of $13,500 cash was indefensible.

Fifth. William Bales was the holder of the $7,000 notes and deed of trust from start to finish. The statement that he "laid by" these notes as collateral security for Johnson amounts to nothing in law. He never even indorsed the notes in blank. He never delivered them to Johnson and it does not appear that either Johnson or his niece Miss Haskins ever

heard of these notes or deed of trust or that they were "laid by" for their benefit. It is a fact, that neither of them ever had possession of the notes or deed of trust.

Sixth.   If Samuel H. Bales paid Miss Haskins $500 on June 4, 1896, he did not thereby become the owner of the seven-thousand-dollar notes and deed of trust, for if the title to those notes and deed of trust passed by being "laid by" as collateral security for what William Bales owed her, then no transfer thereof to Samuel H. Bales would be legal without her consent, and she never consented and never knew it had been done.   If those notes and deed of trust did not pass to Johnson and through him to Miss Haskins by being simply "laid by" in the hands of William Bales, but if notwithstanding such "laying by" thereof the title thereto remained in William Bales, then the payment of $500 by Samuel H. Bales, did not pass the title to the notes, either in law or in equity, to Samuel H. Bales.   The most favorable view that can be taken of this case for the defendants is, that Samuel H. Bales paid Miss Haskins $500 on June 4, 1896, on account of a debt that William Bales owed her, and that thereupon William Bales delivered the notes and deed of trust for $7,000 to Samuel H. Bales as security or in payment therefor.   Even this view will not avail the defendants, for the reasons that in 1889 William Bales had agreed with Mrs. Evans that those notes and this deed of trust should not be enforced against the land until Mrs. Evans was reimbursed for the $13,500 of her money that William Bales had invested in the land, and it is charged that Samuel H. Bales knew of this arrangement.   Further, this alleged transaction took place in 1896.   The last of the two notes fell due in April, 1889.   Therefore, they were long past due when Samuel H. Bales paid the $500 to Miss Haskins and when William Bales delivered them to Samuel H. Bales, he took them subject to all defenses and equities that existed between William Bales and Mrs. Evans, and as between them the positive

undenied agreement was that they were not to be enforced against the property until Mrs. Evans was fully reimbursed. It must be remembered that the $200 and the $1,400 were not paid until after Samuel H. Bales had caused the deed of trust to be foreclosed, and therefore these payments have no bearing upon this case and were not made upon the faith or credit of the collateral security.

Seventh. But assuming that Samuel H. Bales paid Miss Haskins five hundred dollars on June 4, 1896, and assuming that thereupon without her knowledge or consent William Bales had the power and right to transfer to Samuel H. Bales the $7,000 notes and deed of trust that had been "laid by" as collateral security for her, this did not confer any right upon Samuel H. Bales to have the deed of trust foreclosed, for at best he would only have been subrogated in equity to the rights of Miss Haskins to the collateral security, and would not have been the legal holder of the collateral security, so as to entitle him, without notice to Miss Haskins and without the aid of a court of equity, to foreclose the deed of trust.

The circuit court took the proper view of the case and properly set aside the whole transaction and vested the title in the plaintiff.

This conclusion makes it unnecessary to consider any other question in the case, for as the deed of trust and notes for seven thousand dollars were fraudulent in law, they were void, and hence, constitute a cloud upon the plaintiff's title.

The judgment of the circuit court is therefore affirmed. All concur.